United States Court of Appeals,

Fifth Circuit.

No. 94-50595.

Hector POLANCO, Plaintiff-Appellee,

v.

CITY OF AUSTIN, TEXAS, Defendant-Appellant.

March 28, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, and WISDOM and STEWART, Circuit Judges.

STEWART, Circuit Judge:

In this employment discrimination action, Hector Polanco, a Mexican American police officer, alleges that he received more severe disciplinary treatment than his colleague because of his national origin. The City of Austin terminated Polanco after seventeen years with the Austin Police Department (APD), while giving his colleague only a written reprimand although the conduct which provoked disciplinary action was virtually the same for both men. Polanco sued the City under Title VII (42 U.S.C. § 2000e-5) and the Civil Rights Act (42 U.S.C. §§ 1981, 1983). The jury found impermissible discrimination and awarded Polanco $75,000 for expenses incurred, $150,000 for emotional pain and suffering, and $125,000 for injury to his reputation. The district court partially granted the City's motion for remittitur.

The City appeals the district court's remitted judgment of $290,000 as well as the $28,337 award for attorneys' fees and costs. On appeal, the City challenges the district court's denial

of its motion for judgment as a matter of law and/or alternatively its motion for a new trial. Likewise, the City contests the district court's exclusion of testimony of a witness who allegedly could have proven that Polanco did not have a reputation for truthfulness, and therefore, Polanco's reputation sustained no injury from the City's actions. The record amply supports the decisions of the district court. Therefore, we affirm the judgment entered in favor of the plaintiff.

## FACTS

The relevant facts concern Polanco's experience and reputation in the homicide division. Polanco joined the Austin Police force in March, 1976. Although Polanco worked in several units within the police department, Polanco spent three and one-half years working in the homicide division as an investigator before being promoted to the position of Senior Sergeant, which he held at the time of his termination.

While in the homicide division, Polanco developed a reputation of being a premier investigator. He received over forty-five commendations during his seventeen year tenure on the force, some of which he received for exemplary homicide investigations conducted when he was not assigned to the homicide division.

Several commendations arose because of Polanco's assistance with victims who could speak only Spanish. Polanco openly demonstrated his strong affinity with Hispanics and his Mexican heritage. In fact, Polanco became known around the APD as being outspoken on minority issues, especially those involving Hispanics.

2

Polanco's concern for Hispanics resulted in a conflict with his supervisor, Lieutenant Andy Waters, regarding Waters' use of the term "misdemeanor murder." A misdemeanor murder is an informal, derogatory term used by some Anglo APD officers to refer to murders of minority victims. The term is consistent with the perception held by many that murders of minorities received low priority in the APD, and consequently, received less funding, fewer resources, and less time for investigating.

In February 1992, Polanco was assigned as the head of the task force devoted to solving the "yogurt shop murders," a highly publicized group of murders in December, 1991, in which four teenage girls were murdered, mutilated, and burned as they closed the yogurt shop where they worked. Polanco obtained a written confession for the murders from a suspect named Alex Briones in March, 1992. The confession was thrown out after Briones failed a polygraph test regarding the confession.[1] Polanco was removed as head of the task force shortly thereafter.

Suspecting that Polanco coerced the Briones' confession, the Travis County District Attorney initiated an investigation. The grand jury did not return an indictment. When the district attorney completed its investigation without taking any other action, the internal affairs division of the APD inquired into the

---

[1]Briones was given a second polygraph five days later. The second polygrapher concluded that Briones was a psychopath and could not be polygraphed. He therefore concluded that Briones was a viable suspect.

alleged misconduct.[2]

The district attorney's and the internal affairs division's investigations blossomed into a probe of both Polanco and Sergeant Brent McDonald surrounding the confession they received for the February, 1991 murder of a Travis County Sheriff's Deputy named William Redman. Polanco was not working in the homicide division[3] or connected with the Redman investigation at the time he assisted McDonald, the investigator in charge of the case, in eliciting a confession from suspect John Salazar. Salazar began giving McDonald a statement but terminated the interview and refused to complete the statement.

Approximately three hours later, however, Polanco elicited a signed confession from Salazar. The confession specifies that both McDonald and Polanco gave Salazar his *Miranda* warnings but that Salazar gave his statement to McDonald. Polanco's involvement in the interview is undeniable because some descriptions in the statement match almost exactly the wording of the notes Polanco took during the interview. Unbeknownst to either Polanco or McDonald, about fifteen minutes before Salazar signed the

---

[2]The APD continued to pursue the investigation because the burden in its administrative investigation would be the lower burden of proof by a preponderance of the evidence, whereas the burden in Polanco's criminal investigation was proof beyond a reasonable doubt.

[3]Polanco did not transfer into the homicide division until August 1991. Because of a three month injury leave and because no other capital murders of law enforcement officers occurred in Austin during that time, Polanco did not participate in any other homicide investigations of law enforcement officers between February and August of 1991.

4

confession, the true perpetrators confessed to the Redman murder. Salazar's confession eventually was declared "false" because Salazar was actually in APD custody at the time the murder took place. Despite the falsity of the confession, Polanco received the Department's Basics Award because of his assistance with the Redman investigation.

During the trial of the first suspect (Jose Flores) regarding the Redman murder, Polanco testified that he had not obtained a confession from Salazar. The testimony reads as follows:

Q. And at any point did you go into the interview room where Sergeant McDonald was interviewing Mr. John Salazar?

A. Yes, ma'am.

Q. *Did you ever take a written statement or any sort of written confession or written statement from John Salazar?*

A. *No, ma'am. I didn't.*

Q. Did you speak with him?

A. Yes, ma'am. I did.

. . . . .

*CROSS EXAMINATION*

Q. *Sergeant, did you try to take a statement from him?*

A. *No. Sir. I was uniform line supervisor. I was more in there for support.*

Q. You were pinch hitting that night, right?

A. That's correct.

Q. Okay. Did you all try to get a written statement from him?

A. He was interviewed, yes, sir, by several investigators that I know of and Sergeant McDonald as well as myself. Yes, sir.

Q. And was that in an effort to take a written statement from him?

5

A. Yes, sir.

Q. *Did you ever do a draft of a written statement?*

A. *No, sir. I did not.*

Q. Did Sergeant McDonald?

A. Not to my knowledge.

Q. Did you ever—did John Salazar ever sit down and write anything out in his own hand?

A. Not to my knowledge.

In the same trial, McDonald and Salazar testified that Salazar had made a confession to Polanco and McDonald. McDonald's testimony in the Flores' trial reads as follows:

Q. *At some point did you attempt to take a written statement from Mr. Salazar?*

A. *Yes, ma'am.*

.    .    .    .    .

Q. *And did you in fact complete and take a written statement from Mr. Salazar?*

A. *No, ma'am.*

.    .    .    .    .

Q. *Did you in fact ever complete a statement from John Salazar, give it to him to look over and him sign it and then notarize it?*

A. *No, ma'am.... John Salazar terminated the interview.*

*CROSS EXAMINATION*

Q. And no one ever put anything down on paper during this time?

A. Formally or informally? There were notes taken. *There were, you know, notes taken, but as far as a formal confession, completely filled out, notarized as she mentioned, that did not occur.*

Q. Okay. Were these drafts, draft statements that were taken?

6

A. No, sir.

Q. What were they, just your notes?

A. They would have just been notes of what he was saying at the time.

Contrary to this testimony, in the second suspect's (Ernest Perez) case, just twenty-one days later, McDonald testified that he did not take a statement from Salazar, and further said that he just listened to what Salazar had to say.

Q. Officer, the first person who you interviewed as far as the people there at the apartment was Mr. Salazar; is that correct, Officer?

A. Yes, sir.

Q. Sergeant, I apologize. *Sergeant, did you take a written statement from Mr. Salazar?*

A. *No, sir.*

Q. *You just listened to what he had to say; is that right?*

A. *Yes, sir.*

On April 15, 1992, McDonald discovered in his office the confession Salazar made to Polanco and the notes Polanco made during the interview. The phrase "Not Needed" appeared in McDonald's handwriting on the outside of the envelope containing the false confession and notes.

The internal affairs division charged Polanco with aggravated perjury, with failure to supplement reports, and with bringing discredit upon the police force. The division charged McDonald with bringing discredit upon the APD. The APD and the Disciplinary Review Board sustained the charges. Polanco was suspended indefinitely after rejecting a thirty-day disciplinary suspension.

7

McDonald agreed to a written reprimand. Although Polanco received reinstatement on appeal, the APD refused to allow Polanco to return to the homicide division. Instead, the APD assigned him to a walking unit.

Polanco sued the City, alleging employment discrimination. After a three-day trial, the jury awarded Polanco $75,000 for expenses incurred, $150,000 for emotional pain and suffering, and $125,000 for injury to his reputation. The court partially granted the City's motion for remittitur and entered a judgment awarding Polanco $290,200 in damages and $28,337 for attorney's fees.

DISCUSSION

I. *JUDGMENT AS A MATTER OF LAW.*

The City argues that the district court should have rendered judgment as a matter of law in its favor because Polanco presented no evidence of discrimination and because the jury's verdict went against the great weight of the evidence. The City further notes that its witnesses expressly testified that national origin did not factor into the disciplinary decision.

Polanco responds that the City has waived this issue. We disagree. We do not believe the City has waived the right to challenge the sufficiency of the evidence.

A. *Standard Of Review.*

The standard of review of a denial of a motion for judgment as a matter of law depends on whether the defendant has properly preserved the issue by moving for judgment as a matter of law at the conclusion of all of the evidence. *See Bunch v. Walter,* 673

8

F.2d 127, 130 n. 4 (5th Cir.1982). If the City properly moved for judgment as a matter of law, we must analyze the *sufficiency* of Polanco's evidence. *See Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 148 (5th Cir.1995) (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (1969)). If Polanco did not present sufficient evidence, then the district court erred in denying the City's motion for judgment as a matter of law.

The standard for evaluating the sufficiency of evidence is whether the evidence has such quality that reasonable and fair-minded persons would reach the same conclusion. The Fifth Circuit has explained the standard as follows: "We will reject a verdict in those instances when, despite considering all the evidence in the light and with all reasonable inference most favorable to the verdict, we find no evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial discretion could arrive at the same conclusion." *Thrash v. State Farm Fire & Cas. Co.,* 992 F.2d 1354, 1356 (5th Cir.1993) (quotations omitted). A "mere scintilla" of evidence is not enough to send a case to the jury. *Boeing,* 411 F.2d at 374.

However, the standard for review changes if the defendant failed to move for judgment as a matter of law at the conclusion of all the evidence. *See McCann v. Texas City Refining Co.,* 984 F.2d 667, 673 (5th Cir.1993). Where the defendant failed to timely move for judgment as a matter of law, we will consider the issue as waived by the defendant and will treat the issue as being raised for the first time on appeal. Accordingly, we then review the

9

issue of sufficient evidence for mere "plain error." The absence of a motion challenging the evidence prior to submission to the jury precludes the appellate court from evaluating and weighing the evidence to test its sufficiency. *See Bunch,* 673 F.2d at 130 n. 4. When there has been no timely motion, we review only whether the plaintiff has presented *any* evidence in support of his claim. *Id.* ("the question before this Court is not whether there was substantial evidence to support the jury verdict, but whether there was *any* evidence to support the jury verdict" [emphasis added] ). If the plaintiff presented *any* evidence, this court will sustain the denial of the motion for judgment as a matter of law. If, however, we find that no evidence can support the verdict under the lower standard, we will not simply enter judgment for the defendant; instead, we must order a new trial. *Id.*

In response to Polanco's waiver arguments, the City asserts that this circuit construes rule 50(b) liberally. We agree. This court has concluded that

> [t]o demand a slavish adherence to the procedural sequence and to require these defendants, in this case, to articulate the words of renewal once the motion had been taken under advisement, would be to "succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of the rules."

*Bohrer v. Hanes Corp.,* 715 F.2d 213, 217 (5th Cir.1983). Even with a liberal interpretation, however, this circuit has never completely disregarded the requirement that the defendant must move for judgment as a matter of law at the close of all of the evidence. *See McCann,* 984 F.2d at 672. Indeed, in cases where this court has strayed from the requirement that the defendant must

10

move for judgment as a matter of law at the close of the evidence, the departure from the rule was "de minimis," and the purposes of the rule were deemed accomplished.

Technical noncompliance with rule 50(b) is gauged by whether the purposes of the rule are satisfied, not by a formula regarding the number of witnesses, the amount of testimony, or the passage of time after the initial motion. We have repeatedly articulated that "[t]his rule serves two basic purposes: to enable the trial court to re-examine the sufficiency of the evidence as a matter of law if, after verdict, the court must address a motion for judgment as a matter of law, and to alert the opposing party to the insufficiency of his case before being submitted to the jury." *MacArthur v. University of Texas Health Center Tyler,* 45 F.3d 890, 897 (5th Cir.1995). Thus, even when substantial evidence is presented after the motion, we may still find that only a "de minimis" departure from the 50(b) requirement has occurred if the court and the opposing party have been put on notice, before the case goes to the jury, that the plaintiff's proof may be lacking. This generally requires (1) that the defendant made a motion for judgment as a matter of law at the close of the plaintiff's case and that the district court either refused to rule or took the motion under advisement, and (2) and an evaluation of whether the motion sufficiently alerted the court and the opposing party to the sufficiency issue. *See Purcell v. Seguin State Bank & Trust Co.,* 999 F.2d 950, 956 (5th Cir.1993). *Compare McCann,* 984 F.2d at 672 (where the judge flatly denied the defendant's motion at the close

11

of the plaintiff's case) and *Hinojosa v. City of Terrell,* 834 F.2d 1223, 1228 (5th Cir.1988) (where the defendant failed to move for judgment at any time before the court submitted the case to the jury and failed to challenge any of the interrogatories submitted to the jury).

For example, in *MacArthur,* the defendant moved for judgment as a matter of law on all claims at the close of the plaintiff's case. 45 F.3d at 897. The judge decided to "carry that motion along ... for the time." The defendants presented numerous witnesses, and the plaintiff presented two rebuttal witnesses. The defendant renewed the judgment as a matter of law as to all claims but the intentional infliction of emotional distress claim. The judge denied the motion. Because the jury returned a verdict in favor of the plaintiff on the intentional infliction of emotional distress claim, on appeal the defendant challenged the sufficiency of the evidence regarding this claim. This court found that the defendant's technical noncompliance had not "blind-sided" the plaintiff by failing to call her attention to the sufficiency of her evidence. Accordingly, the MacArthur court excused the defendant's noncompliance and examined the evidence under *Boeing v. Shipman. See also Bohrer,* 715 F.2d at 217 (although the defendants presented substantial evidence after the court took the initial motion under advisement, the court excused the defendant's failure to renew the motion at the close of all the evidence because the purposes of the rule were satisfied).

Here, although the City did not renew its motion at the close

of all the evidence, the district court had taken the matter under advisement. The City took one and one-half days eliciting testimony from thirteen witnesses during its case. Polanco presented no rebuttal evidence. We find that the City's failure to renew its motion qualifies as a "de minimis" departure from Rule 50(b). Our precedent makes clear that a strictly mechanical application of rule 50(b) is not required when the court reserves its ruling and the defendant has given notice of insufficiency. A renewed motion by the City would have served no purpose because the district court had already taken the motion under advisement. The initial motion alerted Polanco and the court of the City's challenge to the sufficiency of Polanco's proof of discrimination. The motion, therefore, was essentially in the same posture at the close of the case as it was when the district court took it under advisement. Under these circumstances, we hold that failure to raise another motion for judgment as a matter of law is not detrimental to the City's insufficient evidence claims. Consequently, the standard of review of the sufficiency of Polanco's evidence is whether he has presented evidence with such quality that reasonable and fair-minded persons would reach the same conclusion that the Polanco jury made.

B. *Sufficiency Of The Evidence Presented.*

In responding to the merits of the City's insufficient evidence claims, Polanco argues that he presented more than enough evidence to support the jury's finding that his nationality prompted the firing. Polanco claims that the record portrays

McDonald's conduct as being far more worthy of discipline than his actions. Additionally, he alleges that the City's justification for the disparate treatment was not believable. Further, Polanco claims that he presented evidence of discrimination other than evidence regarding the disparate treatment that he and McDonald received.

We must evaluate the sufficiency of the evidence in an employment discrimination case using the three-tier *McDonnell Douglas* analysis: (1) the plaintiff must establish a prima facie case of employment discrimination, (2) the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions, and (3) the burden returns to the plaintiff to prove that the reason was a pretext for discrimination and that the real reason was to discriminate. *Marcantel v. Louisiana Dep't of Transp. & Dev.,* 37 F.3d 197, 199 (5th Cir.1994) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

The City concedes, and we agree, that Polanco has established a prima facie case of discrimination. The burden of production then shifted to the City to present a legitimate nondiscriminatory reason for its actions.

Accordingly, we must determine whether the City satisfied its burden of production by articulating a nondiscriminatory reason for the disparate disciplines imposed on McDonald and Polanco. The employer satisfies the burden of production regardless of the persuasive effect of the proffered reason. *St. Mary's Honor Center*

14

*v. Hicks*, 509 U.S. 502, ----, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). The City presented evidence that McDonald and Polanco were not similarly situated and that the differences warranted different charges.[4] The City portrayed Polanco as a very good investigator, who had an excellent record and an extraordinary memory. The evidence suggested that Polanco's memory regarding the written false confession should have been clear because it was the only murder that Polanco investigated during the relevant time period. Further, it was an homicide investigation on which he worked while assigned to another division. On the other hand, McDonald was an average policemen with a poor memory. McDonald usually had to rely on notes to trigger his memory and had to be coached extensively before testifying. Further, McDonald could have confused the investigation with other murder investigations in which he participated during the relevant time period. Additionally, there was testimony that Polanco was considered an expert investigator and possessed the duties of a supervisor, whereas McDonald was being closely supervised in his investigations because of his amateur status in the homicide division. We find that the City's evidence, demonstrating that the varying experience levels of the men prevented them from being "similarly situated" and warranted different charges for virtually the same offense, is sufficient to satisfy the City's burden of production.

---

[4]We are focusing on the City's justifications for charging Polanco with a more severe penalty because the criminal charge chosen actually dictated the disciplinary action that the City took in Polanco's case. The Civil Service Code mandates the disciplinary action applicable for a particular charge.

Thus, the issue of sufficiency in this case rests entirely on whether Polanco has proven that the City's reasons for the disparate treatment was a pretext for discrimination against him and that the City discriminated against him. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, ----, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). The Supreme Court in *Hicks* explained that a plaintiff must prove both that his employer discriminated against him and that discrimination was a motivating factor in the treatment the plaintiff received.

> The defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven "that the defendant intentionally discriminated against [him]" because of his race.... The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection "[n]o additional proof of discrimination is required"....

*Hicks,* 509 U.S. at ----, 113 S.Ct. at 2749. If the factfinder's verdict apparently rejects the defendant's proffered reason, enough evidence must exist in the record for the factfinder to infer that discrimination was the true reason for the disparate treatment. *See Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1995) (en banc).

Accordingly, in the present case, the jury first had to reject the City's reason that McDonald and Polanco were not similarly situated. The evidence had to contradict the legitimacy of the City's explanation that the differences between Polanco and

16

McDonald justified the different charges and penalties, such that the factfinder could reject the proffered reason. *See EEOC v. Louisiana Office of Community Serv.,* 47 F.3d 1438, 1443-44 (5th Cir.1995).

Here, the jury reasonably could have concluded that the differences in memory capacity and experience were not as exaggerated as the City contended. McDonald began working on the APD in 1974, two years before Polanco. Even assuming that McDonald's memory was not as keen as Polanco's memory, his memory most certainly should have been jogged by the questions he answered during the trial of the first suspect (Jose Flores) in the Redman murder. A jury could believe that it was inexcusable for McDonald to have given a different answer to virtually the same line of questioning in the second suspect's trial (Ernest Perez), just twenty-one days later. A reasonable factfinder could find implausible the argument regarding the incompetence of McDonald's memory in light of the surrounding circumstances.

Similarly, a reasonable juror could have disregarded the City's arguments that the men were not similarly situated because Polanco had a motive to lie. The record shows that McDonald was no less culpable than Polanco. McDonald had begun taking a statement from Salazar. McDonald had possession of the false confession. McDonald should have supplemented the Redman file; he was in charge of the investigation, and he actually had the document. That McDonald probably had custody of Salazar's confession since it was obtained is a conclusion the jury could easily have reached.

17

The envelope containing the confession bore McDonald's handwriting. McDonald found the envelope in his office. A jury reasonably could conclude that McDonald's harboring the false confession prevented him from wearing a badge of innocence. A reasonable and fair-minded juror could reach the conclusion that the alleged differences between the two men could not mask the fact that both men testified inaccurately and, therefore, committed the same offense. Thus, the jury could have properly rejected the nondiscriminatory reason articulated by the City that McDonald and Polanco were not similarly situated. A fact issue therefore existed regarding the City's true reason for treating Polanco and McDonald differently. *See Rhodes,* 75 F.3d at 994.

Having concluded that a reasonable jury could have rejected the City's nondiscriminatory reason, we still must evaluate the entire record to determine whether Polanco presented sufficient evidence from which a reasonable jury could infer that the City intended to discriminate against Polanco because of his national origin. Polanco had to prove by a preponderance of the evidence that the City's reasons were actually a pretext for discrimination. *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 958 (5th Cir.1993). In *Rhodes,* this court clarified the plaintiff's burden to produce sufficient circumstantial evidence to overcome judgment as a matter of law after the record reasonably allows the jury to reject the employer's proffered reason:

> To sustain a finding of discrimination, circumstantial evidence must be such as to allow a rational factfinder to make a reasonable inference that age was a determinative reason for the employment decision. The factfinder may rely

18

> on all the evidence in the record to draw this inference of discrimination. In tandem with the prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence. Thus, a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains.

*Id.* at 994. This court indicated that, under *Hicks,* the evidence in the record (taken as a whole) must create a fact issue regarding the reason for the employment action and must raise an inference of discrimination. If the evidence is such that fair-minded jurors would reach the same conclusion (i.e., that a fact issue is raised *and* that discrimination was the true reason), then the plaintiff has satisfied his burden even though he does not present any additional evidence on rebuttal. It is within these parameters that we will evaluate Polanco's evidence of discrimination.

We find that the record raises the necessary fact issue (as discussed above) and also allows a permissible inference of discrimination. Polanco testified that he did not intentionally testify inaccurately. Polanco said that he testified truthfully according to the information and beliefs he possessed at the time of trial. Further, he testified that he often refreshed his memory regarding a case by reading the case file shortly before testifying. Polanco said that he would not have testified the way he did if the confession had appeared in the "case jacket" with all

19

the other information regarding the Redman case.[5]

Additionally, evidence adduced at trial minimized the significance of the fact that the confession was false, and demonstrated that the falsity of a confession does not guarantee that it will be remembered. Polanco presented testimony from Officer Robert Martinez, who is the most decorated officer on the APD, that during his tenure in homicide he had taken confessions that turned out to be false. Similarly, Sergeant Gary Flemings, who handled the internal affairs investigation of Polanco, testified that he has taken between twenty-five and thirty confessions that he later discovered were false. Sergeant Michael Kimbro also testified that getting an untrue confession does not happen every day, but it happens.

Polanco's testimony that he did not independently recollect taking Salazar's statement was bolstered by testimony elicited on cross examination from defense witness Sergeant Michael Huckabee. Huckabee obtained the false written confession from Alex Briones in the highly publicized yogurt shop murders investigation. Polanco and a fellow officer had obtained a confession from Briones on tape; however, Huckabee reduced the confession to writing and had obtained Briones' signature. Despite the publicity, the falsity of

_____

[5]The City emphasizes that if Polanco had supplemented the record, he would have seen a reference to the false confession when he read the case file shortly before testifying. However, Officer Robert Martinez testified that it was not unusual for homicide investigators not to write supplements to case files. Also, Martinez said he had never been disciplined when he failed to supplement a case file regarding his participation in an interview for a case to which he had not been assigned.

20

the confession, and Huckabee's direct participation in eliciting the confession, he testified that he did not recall whether he had gotten a completed statement because he did not remember Briones signing the confession. Briones had, in fact, signed the false confession. Defense witness Huckabee made credible Polanco's story that he misremembered. A jury was, therefore, free to find that Polanco's testimony was inaccurate, but was not intentionally untrue. Further, Sergeant Gary Flemings clarified that inaccurate testimony is not synonymous with perjured testimony.

Polanco also exposed deficiencies in the evaluations conducted by the Disciplinary Review Board and Polanco's supervisors regarding McDonald's testimony. Polanco specifically sought explanations regarding McDonald's inaccurate testimony in the Perez trial, which was given twenty-one days after the Flores' trial. The following testimony was read repeatedly to the jury:

Q. Sergeant, did you take a written statement from Mr. Salazar?

A. No, sir.

Q. You just listened to what he had to say; is that right?

A. Yes, sir.

When questioned about McDonald's testimony in the Perez trial, some APD officials indicated that the testimony was not considered at all, while others gave ambivalent answers to explain why McDonald had not perjured himself by giving inaccurate testimony regarding information with which he should have been very familiar. When Darla Espinoza met with McDonald before the Flores trial, they discussed the incomplete statement that McDonald began. Further,

21

McDonald testified about the partial statement just twenty-one days prior to the Perez trial. McDonald was well aware that he had done more than listen to Salazar when interviewing him. A reasonable factfinder could have rejected the less than satisfactory explanations regarding McDonald's inaccurate testimony. In sum, the evidence allowed a reasonable jury to conclude that the City's reason for charging Polanco with aggravated perjury while charging McDonald with bringing discredit, although both men were guilty of giving inaccurate testimony, was merely a pretext for discrimination. Both offenses warranted similar charges and penalties. The failure to give equal treatment to the same offense allowed the jury to assume the presence of mendacity.

Not only does the record contain evidence that the City's reason was a pretext for discrimination, Polanco also presented evidence of national origin discrimination from other officers. First, Polanco introduced testimony from Sergeant Carlos Botello, who worked in internal affairs for fourteen years, that the internal affairs investigation process is a biased procedure tainted by discrimination. Botello also identified aspects of the Polanco investigation that deviated from other investigations. For example, Botello said it was extremely unusual that internal affairs conducted an investigation of Polanco, who already had been investigated, after he was terminated. Botello also found suspicious the close investigation that took place between the district attorney's office and internal affairs. Normally, simultaneous investigations by the two entities remain completely

22

separate, while in this case the district attorney and internal affairs coordinated their efforts.

Second, Polanco presented testimony regarding a pervasive discriminatory attitude toward Hispanic officers in the APD. He explained that this attitude was particularly exhibited by some of the men involved with the decision to suspend him.[6]  Martinez testified that Lieutenant David Parkinson was very prejudiced against Hispanics.  Parkinson treated Hispanic officers differently from Anglo officers and used racial slurs involving Mexicans. Martinez also testified that Robert Gross mishandled some disturbances involving Hispanics and treated Hispanic officers differently than Anglo officers.  Further, Martinez testified that Deputy Chief Ken Muennick treated Hispanic officers differently than Anglo officers.  Sergeant Rodrigo Herrera testified that Parkinson hid his prejudices against Hispanics.  Herrera also said that Captain Bobby Shirley was prejudiced and suspended Herrera for five days because of his Hispanic heritage.  Captain Juan Gonzalez also believed that he received a harsher discipline because of his ethnicity.

Finally, Polanco demonstrated that discrimination against Hispanics pervaded the quality and length of homicide investigations involving Hispanic victims.   Officer Martinez

---

[6]Four of the five men on the Disciplinary Review Board voted to sustain the allegations against Polanco:  Deputy Chief Robert Gross, Captain Bruce Mills, Captain Pete Neal, and Lieutenant Paul Looney.  Lieutenant Michael Kimbro, Polanco's representative, voted not to sustain the perjury charge.  Lieutenant Davis Parkinson and Captain Bobby Shirley both were in Polanco's chain of command and involved in the decision to discipline Polanco.

discussed Lieutenant Parkinson's use of the term "misdemeanor murders." He testified that Parkinson said, "This Mexican here, this is a misdemeanor murder. And we don't need no overtime on this. We'll get on it tomorrow." Similarly, Parkinson instructed officers that they had only twenty-four hours to solve a minority's murder. Martinez explained: "I have observed [Parkinson] not paying attention to Hispanic victims getting murdered, several times, and assigning detectives just for 24 hours and then giving them something else to do. In other words, I've heard him say that any time a Hispanic or black gets killed, it's misdemeanor murder, especially if they get killed in a bar room fight." For these reasons, the murders of minorities often remained unsolved.

The record demonstrates that there were two sides to this discrimination case. The jury heard both sides and chose to believe Polanco's view of the evidence. *See Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1146 (5th Cir.1991). The jury has spoken. It is not within the province of this court to disturb a jury's finding which is supported by the record, even if this court would have been inclined to rule differently had the matter been presented to it in the first instance. This court explained in *Wilson* that when the jury chooses between two clearly identifiable factual stories in a discrimination case, the jury's verdict must be affirmed:

> The jury heard both sides and the jury spoke. That is about all there is to say about age discrimination liability in this case. There were clearly two sides to this case. The jury chose to believe Wilson and his evidence; it did not believe Gozon and Monarch. Consequently, the jury's verdict on age discrimination is affirmed.

24

*Id.* We are, therefore, obligated to affirm the jury's verdict, provided that the record before us supports the jury's finding.

After a thorough review of the record, we are confident that sufficient evidence existed for the jury to reach the conclusion that the City's disparate treatments of McDonald and Polanco emanated from a discriminatory motive. *See Purcell v. Seguin State Bank & Trust Co.,* 999 F.2d 950, 957 (5th Cir.1993) (noting that it is not unusual for a discrimination case to consist mostly of circumstantial evidence); and *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1251 (5th Cir.1995) (acknowledging that even when the evidence is less than compelling, it is not the appellate court's role to weigh the evidence).

We reach this conclusion even though a significant amount of Polanco's evidence involved proof of discriminatory practices in the workplace. Evidence of the APD's hostile treatment of and attitude toward Hispanics is probative of whether Polanco was terminated because of his nationality. *See Kelly v. Boeing Petroleum Servs.,* 61 F.3d 350, 358-59 (5th Cir.1995) (acknowledging the probative value of an atmosphere of discrimination). The APD's discriminatory treatment of Hispanic officers and victims has significant bearing on the issue of whether the same discriminatory motive affected the decisions concerning Polanco. Evidence of the discriminatory atmosphere and the biased investigation combined with the rejection of the City's proffered reason support the jury's finding of discrimination. Because sufficient evidence existed for reasonable, fair-minded factfinders to reach the same

25

conclusion, we hold that the district court did not err in denying the City's motion for judgment as a matter of law. We, therefore, will not disturb the jury's determination that the City terminated Polanco because of his nationality.

II. *NEW TRIAL.*

The City argues that the district court erred in not granting it a new trial because the evidence was insufficient and because the verdict was against the weight of the evidence. It asserts that its witnesses, seven of whom were directly involved with Polanco's disciplinary decision, testified that national origin was not a factor in the decision to suspend Polanco and that there were marked differences between Polanco's and McDonald's testimony. The City argues that by contrast, Polanco's witnesses had no personal knowledge about Polanco's investigation and testified only about remote discriminatory incidences that were unrelated to Polanco.

The denial of a motion for new trial based on insufficiency of the evidence is reviewed for an abuse of discretion. *See Lloyd v. Georgia Gulf Corp.,* 961 F.2d 1190, 1196 (5th Cir.1992). The district court abuses its discretion if "there is an absolute absence of evidence to support the jury's verdict." *Roberts v. Wal-Mart Stores, Inc.,* 7 F.3d 1256, 1259 (5th Cir.1993); *see also Bunch v. Walter,* 673 F.2d 127, 130-31 n. 4 (5th Cir.1982). Similarly, the decision to deny a motion for new trial because the verdict was against the weight of the evidence is reviewable under an abuse of discretion standard. *United States v. Dula,* 989 F.2d 772, 778 (5th Cir.), *cert. denied,* --- U.S. ----, 114 S.Ct. 172,

126 L.Ed.2d 131 (1993). When the party has had the opportunity to challenge the witnesses credibility and the factfinder has chosen to believe the witnesses, the appellate court will not generally intrude on the decisions reached. *Id.* The trial court does not abuse its discretion in accepting the jury's evaluations regarding the witnesses' credibility. *Id.*

As we detail above, Polanco presented sufficient evidence for a reasonable jury to conclude that the City discriminated against Polanco because of his national origin. The jury chose to believe Polanco and his witnesses. The trial court did not abuse its discretion by accepting the jury's credibility determinations.

III. *PREJUDICE, BIAS, AND SYMPATHY FACTOR.*

The City argues that jury prejudice, bias, and sympathy is evidenced in the excessive jury award. Also, the City asserts that the jury's award exceeds by about 200% the relief requested by Polanco. Further, during deliberations, the jury asked whether answering "yes" to question two would disallow relief to Polanco. The City contends that the jury's question suggests that the jury did not want to adhere to the district court's instructions.

Polanco counters that because the award is supported by sufficient evidence, it is not reflective of prejudice, bias, and sympathy. Further, he indicates that the amount of the award demonstrates the jury's attempt to afford complete compensation. Polanco indicates that the judge granted the City's motion for remittitur and cured any potential harm to the City caused by any alleged overcompensation. Finally, he suggests that the judge's

27

answer to the jury's question cured any potential problem that existed.

The decision to deny a motion for new trial, which has been requested because the jury's verdict reflects prejudice, bias, or sympathy, is reviewed for an abuse of discretion. *Eiland v. Westinghouse Elec. Corp.,* 58 F.3d 176, 183 (5th Cir.1995); and *Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 178 (5th Cir.1992). The district court abuses its discretion if it enters a clearly excessive verdict. *Id.* "A verdict is excessive if it is contrary to right reason or entirely disproportionate to the injury sustained." *Id.* (Quotations omitted).

In the case at bar, the district court recognized that the verdict was excessive and partially granted the City's motion for remittitur. The City correctly indicates that technically Fifth Circuit jurisprudence dictates that the court is supposed to grant a new trial rather than remittitur when an award results from passion or prejudice. *See Lowe v. General Motors Corp.,* 624 F.2d 1373, 1383 (5th Cir.1980). However, the Fifth Circuit in *Lowe* explained that when the award is deemed merely "excessive," the district court may remit the award. Further, where the district court has remitted the award, the Fifth Circuit will assume that the district court believed that the award did not result from passion or prejudice. *Id.* ("By suggesting that the verdicts in the case before us could be cured by remittiturs, ... we conclude that the District Court did not really believe that a new trial on this issue was absolutely necessary due to bias, passion and

28

prejudice. It was, instead, addressing the similar although distinct question of "just too much,' that is, excessiveness.").

We find that by remitting the award, the district court acknowledged that the large amount was not necessarily due to prejudice, bias, or sympathy. Also, the district court either did not read anything into the jury's question or believed that its answer cured any problems possibly underlying the question.[7] Thus, we hold that the present remitted award is reasonable and not reflective of prejudice, bias, or sympathy.

IV. *EXCLUSION OF TESTIMONY*.

The City argues that it is prejudiced by the omission of testimony from Officer Kim Nolte, a colleague with whom Polanco had had an extra-marital affair. The City claims that the evidence allegedly would have addressed Polanco's reputation for truthfulness. The City feels Nolte's past relationship should have gone to the weight of her evidence rather than operated to exclude her testimony on admissibility grounds. Further, the City contends that the absence of the evidence effected the verdict because the jury awarded Polanco $125,000 for damage to his reputation. Nolte developed an opinion regarding Polanco's reputation from a personal and professional perspective. Because none of the City's other witnesses attacked Polanco's reputation, the City maintains that the jury received no contradictory evidence that the City harmed

---

[7]The judge responded to the jury's question as follows: "Answer the question or questions following the instructions of the Court and based on the preponderance of the evidence. The Court will later determine the effect of your answers regarding any judgment to be entered in this case."

29

Polanco's reputation with the suspension. On the other hand, Polanco argues that the evidence was properly omitted because Nolte is simply an angry ex-girlfriend.

We review a ruling to exclude evidence only for "abuse of discretion." *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 271 (5th Cir.1994). The district court does not abuse its discretion if the error is merely "harmless." *Id.* We "will not disturb an evidentiary ruling, albeit an erroneous one, unless it affects a substantial right of the complaining party." *Polythane Sys. Inc. v. Marina Ventures Int'l, Ltd.,* 993 F.2d 1201, 1208 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1064, 127 L.Ed.2d 383 (1994). We will consider the record as a whole when ascertaining whether an error prejudices the complaining party by effecting the verdict. *Id.* at 1209.

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." Courts have allowed testimony from witnesses who were once intimately involved with a party, even where the testimony is challenged under a privilege. *See, e.g., United States v. Brown,* 605 F.2d 389, 396 (8th Cir.1979), *cert. denied,* 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979) (the court found no basis to reverse the conviction where the wife testified against her husband although her husband had left her two weeks after they married, she had not seen him since his departure, and he had forged her name on several checks); *United States v. Lustig,* 555 F.2d 737, 743 (9th

Cir.1977), *cert. denied,* 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977) (after the court denied the defendant's motion to exclude testimony of his former wife, he argued that her "testimony was given because of a desire for revenge arising out of certain unrelated events;" the appellate court found no error in the trial court's decision to allow the testimony). Although the cited cases involved challenges under the marital privilege, the cases demonstrate that "anger" and "revenge," emotions often associated with ex-spouses and ex-girlfriends who parted on less than friendly terms, are not sufficient (by themselves) to outweigh the probative value of the testimony. However, the potential prejudice caused by testimony from a particular ex-spouse or ex-companion must be assessed within the context of the particular case at hand.

Nolte's status as an angry ex-mistress should have tilted the balancing test in Rule 403 in favor of exclusion. Nolte's testimony regarding Polanco's truthfulness stemmed directly from the three and one-half years extra-marital affair he was having with her. During the hearing regarding Nolte's testimony, the City admitted that Nolte would testify regarding Polanco's character for truthfulness based upon the relationship she had with him. It was obvious from the City's proffered testimony that Nolte's testimony was imbued with her frustrations regarding their failed relationship. The lies she discussed in the proffer demonstrated that Nolte could only testify regarding lies Polanco allegedly told to her. Nolte did not indicate that Polanco told these lies to anyone else, and she mentions nothing about Polanco's *reputation*

31

for truthfulness in either the department or the community. Consequently, the jury would be compelled to focus on the extra-marital relationship rather than Polanco's reputation for truthfulness in the community. Under these circumstances, Nolte's testimony would have been unduly prejudicial. We hold, therefore, that the district court did not abuse its discretion in excluding testimony from an angry ex-mistress where the circumstances indicate the testimony would have been more prejudicial than probative.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.