**Cheryl R. GAZDA, Plaintiff,**

v.

**PIONEER CHLOR ALKALI COMPANY, INC., Defendant.**

No. CIV. A. H–96–1265.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 10, 1997.

L. G. Clinton, Jr., L. G. Clinton Jr., and Associates, Houston, TX, for Plaintiff.

Kay L. Burkhalter, Seyfarth, Shaw, Fairweather & Geraldson, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

### I. INTRODUCTION

The Court has considered the Motion for Summary Judgment and Brief in Support [Doc. # 37] ("Defendant's Motion") filed by Defendant Pioneer Chlor Alkali Company, Inc. ("Pioneer") pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking summary judgment on each of Plaintiff's claims. The Court also has considered Plaintiff's Motion for Partial Summary Judgment [Doc. # 39] ("Plaintiff's Motion"), in which Plaintiff seeks summary judgment on the Americans With Disabilities Act ("ADA"), and the Family and Medical Leave Act ("FMLA").

Plaintiff, Cheryl R. Gazda ("Gazda") was employed by Defendant Pioneer as a Computer Operations Coordinator effective December 1, 1992. Beginning on June 22, 1995, Plaintiff stopped coming to work. Plaintiff's employment was terminated effective August 11, 1995. On August 24, 1995, Gazda filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination, retaliation, and disability discrimination. By her Complaint, Gazda sues Pioneer for alleged sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act, violation of the ADA and FMLA, retaliation for opposing alleged unlawful employment practices in violation of Title VII, and intentional infliction of emotional distress under Texas state common law.

Adequate time for discovery has passed, and Pioneer seeks summary judgment on all claims asserted against Pioneer by Gazda in her Original Complaint. Plaintiff has cross-moved as to the ADA and FMLA claims.

Defendant is entitled to summary judgment on each of Plaintiff's claims because:

a. Gazda has failed to establish a *prima facie* case of sex discrimination or sexual harassment. Alternatively, Gazda has failed to present more than a scintilla of evidence to show that Defendant's articulated non-discriminatory basis for termination or her treatment during employment was a mere pretext for intentional discrimination;

b. Gazda has failed to establish a *prima facie* case of retaliation for filing an EEOC charge or complaining of conduct alleged to violate Title VII. Gazda failed to present more than a

scintilla of evidence that Defendant's articulated explanation was a mere pretext for intentional retaliation;

c. Defendant is entitled to judgment as matter of law on Gazda's claims for employment termination in violation of the ADA, since she was unable to perform the essential functions of her job as Computer Operations Coordinator with or without reasonable accommodation;

d. Gazda cannot state a claim against Pioneer for alleged violation of the FMLA, as Gazda is not an eligible employee for coverage under the Act. Pioneer does not now and did not in 1995 have the requisite number of fifty employees at or within 75 miles of the Houston work site at which Gazda worked; and

e. Gazda cannot establish that the conduct complained of relating to her termination is sufficiently extreme and outrageous to state a claim for intentional infliction of emotional distress under Texas state law.

## II. BACKGROUND FACTS[1]

Pioneer Management Information Systems ("MIS") Director Paul Yust hired Cheryl R. Gazda, a white female, effective December 1, 1992, as the company's Computer Operations Coordinator in Houston. Throughout her tenure at Pioneer in Houston, Gazda worked at the corporate headquarters' offices located in Houston, Texas.[2]

Pioneer owns two chlor-alkali manufacturing plants.[3] Fewer than fifty people were employed on Pioneer's payroll (and its subsidiaries and parent company) in Texas in June 1995, and throughout 1995.[4] There were never 50 or more employees within 75 miles of its Houston office in 1995.

At all times during her employment by Pioneer, Gazda was an at-will employee. Gazda's duties while working for Pioneer were to maintain and install upgrades for the company's main frame and other computer systems. Due to the nature of Gazda's job, it was frequently necessary for her to work weekends and holidays because the computer systems often could not be repaired during Pioneer's normal business operations. Defendant contends that Gazda lacked certain skills required for her position when she was hired as a permanent employee of Pioneer in 1992.[5] Ms. Gazda does not dispute this fact and agreed at the time she was hired as a full-time employee that she would take all steps necessary to improve her skills.

Robert Bissett was Systems Support Coordinator in Defendant's Management Information Systems ("MIS") Department during Gazda's employment.[6] Greg Percival was the Network Analyst/PC LAN Coordinator, which was the primary liaison between all employees and the personal computers and their networking systems.[7]

---

1. By and large, these facts are established by the affidavits and exhibits submitted by Defendant. Plaintiff has submitted no evidence that contradicts Defendant's affidavits, except where set forth herein.

2. Prior to being hired by Pioneer as a permanent employee effective December 1, 1992, Ms. Gazda worked at Pioneer's offices from September 1992 through November 30, 1992 as a contract employee. She was working through Adia Technologies, a temporary employee contracting agency, and reporting to Paul Yust at Pioneer.

3. The company has more than 50 employees nationwide.

4. The only relevant company considered in this Motion is Ms. Gazda's employer, Pioneer Chlor Alkali Company, Inc. Plaintiff may attempt to reach the FMLA threshold of 50 employees within 75 miles of Ms. Gazda's work site by improperly seeking to include employees of related parent and subsidiary companies. These entities have no employees in Texas, however, and are addressed here in an attempt to circumvent such an argument.

5. These included, according to Defendant, telecommunications skills.

6. According to Defendant, Bissett's position required more programming knowledge and expertise in the main frame computers, PC and LANs than did Ms. Gazda's job, and Bissett's position was classified as "exempt" (meaning that he received a salary and was not paid hourly overtime wages). Mr. Bissett's job description demonstrates the differences between his position and that held by Ms. Gazda.

7. The job description of Percival's position reveals that it required more skills than those re-

## A. Plaintiff's Complaints About the St. Gabriel Trip of February 1993 and Pioneer's Response [8]

In February 1993, Bissett and Gazda went to St. Gabriel, Louisiana, acting under instructions from their supervisor Yust and were scheduled to perform computer services at Pioneer's chlor-alkali manufacturing plant there. Gazda complains that during the time she and Bissett were together in St. Gabriel, Bissett used profanity and made numerous inappropriate comments to her, and touched her in threatening (but non-sexual) ways during arguments.[9] In discovery, Gazda has produced diary notes documenting these events, which she wrote and gave to Yust shortly after her return to Houston.[10]

Gazda called Yust from St. Gabriel on Saturday, February 27, 1993, and reported Bissett's behavior, which she felt was inappropriate. Yust immediately called Bissett and ordered him to return to Houston. Yust also reported the complaints to Yust's own supervisor, George Henning, chief financial officer of Pioneer. Yust and Henning immediately began an investigation, which included interviews of Gazda and Bissett. They counseled Bissett to be more professional in his behavior and warned him that directing profanity at any other employee was not acceptable. The chief complaint they perceived from Gazda was that Bissett had been unkind to her. Yust and Henning concluded that there had been no sexual harassment. They counseled both parties to behave more like a team and work together.

Pioneer had a sexual harassment policy in place in February 1993. Yust followed this policy in promptly investigating Gazda's complaints.

## B. Additional Allegations by Plaintiff of Inappropriate Conduct Allegedly Constituting Sexual Harassment or Sexual Discrimination

### 1. Alleged Harassing Behavior.—The

St. Gabriel incidents occurring in February 1993 are the primary basis for Gazda's sexual harassment claim. However, Gazda also asserts that she was subjected to additional sexual harassment during her employment, which included:

a. Sara Rasmussen, the Human Resources Supervisor, and/or Maria Montoya, Payroll and Benefits Administrator, allegedly referred to Gazda's high heels as "fuck me pumps."

b. Yust allegedly "pass[ed] wind," scratching and burping in Gazda's office and performing other unpleasant bodily functions in her presence.

c. Bissett allegedly snapped the bra strap of a co-worker, Cathy Barrows, in 1994.

d. Another Pioneer employee, Scott Wilderman, used the word "fuck" in her presence and reporting her to her superiors because it took her too long to fix his computer.

e. Bissett allegedly used the word "fuck" with other employees within Gazda's earshot.[11]

f. Yust allegedly criticized Gazda's long fingernails, high heels, and dresses, and asked her to wear Dockers-type pants, because her job required her to crawl under desks and move computers.

quired for Ms. Gazda's job. Percival's job position was also classified as exempt.

8. All conduct allegedly constituting sexual harassment of which Gazda complains that took place in 1993 relates to the incidents allegedly occurring in St. Gabriel.

9. Defendant's evidence establishes that Gazda brought the wrong tapes for downloading the information, delaying the entire project. Gazda has explanations for the error. However, the details are immaterial to the outcome of the claims.

10. In her deposition, Gazda concedes that she is now alleging some details about the incidents that she "omitted" when she made her written record of the events in 1993.

11. Gazda claims she heard Bissett use profanity after speaking with an employee at another facility, who Bissett claimed was being rude to him on the phone. Gazda reported the profanity to her supervisor, and then complained further to Yust's supervisor. She took offense when she was told to mind her own business after demanding to know the punishment Bissett was to receive.

g. Rasmussen criticized Gazda's high heels and long flowing dresses, which Rasmussen believed created a safety hazard.[12]

h. Henning required Gazda to report to Yust, and then Henning generally took Yust's side when Gazda complained.[13]

i. Gazda's co-workers ceased to ask her to lunch on or after February 1993.

j. Bissett had a "nicer" office than Gazda had.

**2. *Plaintiff's Salary and Terms and Conditions of Her Employment.*—**Gazda was originally employed by Pioneer at a monthly salary of $2,583.33 per month. She received time and one-half pay for her overtime work. Gazda received no raise in 1994 because there was a salary freeze in effect in 1994 for office employees of Pioneer.[14] Gazda did not receive a raise in 1995 because her performance was rated at a "2," which was below the acceptable level. Pioneer's company policy is such that persons receiving a performance rating of "2" automatically do not get a raise.[15]

No other employee at Pioneer had the same job duties as Gazda. The two other non-managerial employees in the MIS Department during Gazda's employment, Percival and Bissett, were exempt employees with different job duties who did not get paid for overtime work.[16] Gazda was given the choice of whether her position would be exempt or non-exempt; she chose to be non-exempt because she was aware that the job required substantial overtime and Pioneer agreed to pay her for the extra hours she had to work.

Gazda claims that from the time she was hired by Pioneer until her employment termination she was forced to work excessive hours and to work a disproportionate share of weekends. She acknowledged, however, that she knew overtime would be required upon commencement of her employment, which consisted of installing upgrades on Defendant's computer system, work that could not be done during ordinary business hours. Gazda concedes that she was the only person in the MIS Department who was compensated for overtime, and that her co-workers in that department also worked during the overtime hours even though their positions were salaried.

After Gazda's March 1995 review, Yust, Rasmussen and Henning discussed the possibility of providing additional training for Gazda. They also discussed whether the training would be effective or whether her performance was such that she should be terminated at that time. They decided to set out a plan to assist Gazda in obtaining additional training. This included a program to be tested for proficiency level, formal classes to attend, and one-on-one training with Yust.

Thereafter, Gazda printed from her supervisor Yust's computer, without his knowledge or consent, an e-mail message sent by Rasmussen to Henning and Yust expressing concerns about Gazda's continued employment. She also printed, without authorization, e-mails between Yust and Henning discussing her performance problems, possible testing, and possible employment termination.

**C. *Events After Gazda Stopped Coming to Work***

On Thursday, June 22, 1995, Gazda left a note on Yust's desk informing him that she might not be in the next day because she was having difficulties with her menstrual cycle.

12. Rasmussen observed Gazda trip over her dress and get it stuck in computer equipment or under her swivel chair on several occasions.

13. Plaintiff admits that she does not believe Henning did this because of her sex, but rather because he did not want any conflict with Yust.

14. She and Carol Zeller, also a new employee, received the same .33% merit increase on April 1, 1993 (prorated under Pioneer's established guidelines from 1.16% because each had worked only one month of the previous year). On September 2, 1994, Gazda received her formal performance review, which indicated that she was not meeting expectations. She received a "2" rating out of "5," indicating "Some Improvement Needed." Yust told her that continued performance at that level was not acceptable.

15. As in 1994, she was warned that performance at this level was not acceptable.

16. As such, their job duties and pay cannot be compared with Gazda's.

She did not report to work the following day, Friday, and on Monday, June 26, she called in sick. On Tuesday, June 27, Yust found a handwritten note from Gazda on his desk saying that she was having more tests the following day and might have to be hospitalized, and that she would keep him informed. On June 30, Pioneer received a certificate to return to work, certifying that Gazda was under the care of Dr. Donald Hearn from June 26, 1995 to June 30, 1995, and stating that Gazda would be able to return to work on July 3, 1995. The Pioneer offices were closed on July 3 and 4, 1995.

On July 5, 1995, Gazda did not come to work. Yust called Gazda's home, but was unable to reach her. Gazda contacted Rasmussen later that day and stated that she had "gotten some help." Gazda also informed Rasmussen that at the request of Gazda's doctor, Kathy Flanagan, Rasmussen was the only one at Pioneer with whom Gazda was supposed to talk. Gazda asked that Rasmussen tell everyone, especially those in the MIS Department, that they were to have *no* contact with Gazda. At this time, Gazda gave Rasmussen Dr. Flanagan's fax and phone numbers, since Rasmussen explained that Pioneer needed written confirmation of the need for these arrangements because Gazda's absence had already exceeded the three-day limit established by Pioneer's Short–Term Disability Plan, and the Plan required a doctor's excuse. Gazda did not inform Rasmussen of Dr. Flanagan's specialty or the reasons for Gazda's treatment.

Also on July 5, 1995, in response to phone calls Rasmussen made to Dr. Flanagan requesting information as to the reason for Gazda's treatment and a return to work date, Dr. Flanagan wrote a letter to Rasmussen, informing her that Gazda was under the doctor's care and that it was her medical recommendation that Gazda not return to work for at least two weeks. Pioneer therefore expected that Gazda would return to work on July 20. Nothing in the letter from Dr. Flanagan explained the purpose of the treatment or cause for the leave.

On July 11, 1995, Gazda called Rasmussen and told her that if Gazda could not return on July 20, she expected that she would only need one additional week of leave. Without explanation, however, Gazda failed to return to work on July 20. Maria Montoya, the Payroll and Benefits Administrator for Pioneer, called Gazda on that date and left a message on her answering machine. Thereafter, on July 20, Dr. Flanagan wrote a letter to Maria Montoya, copy to Rasmussen, stating that Gazda continued under her care and would be on "medical leave for an indefinite period" of time. Dr. Flanagan strongly recommended that Gazda not have any contact with or be contacted by her employer, and that "[a]ny and all communication or information needed regarding her condition or status" should be forwarded through Dr. Flanagan.

On July 24, 1995, Rasmussen called Dr. Flanagan again and requested information on the doctor's diagnosis and prognosis of Gazda, Gazda's expected return date, and the type of reasonable accommodation Pioneer could offer to assist Gazda and allow her to perform the essential functions of her job. Despite Gazda's absence from work for more than one month, Pioneer had no information about Gazda's health problems throughout this time. On July 26, 1995, Dr. Flanagan sent another letter to Rasmussen stating that Gazda was under her care. The doctor's letter was brief; the sole response to the company's inquiry was:

Cheryl Gazda is currently under my care. She is being treated for diagnostic code 296.20. She will be on medical leave for an indefinite period of time. In response to your question "how the problem could be eliminated?"; it is difficult to know at this time.

If you have any questions or need further information, please do to hesitate to call.

Rasmussen called Dr. Flanagan's office and was informed by Dr. Flanagan's nurse that the code reference "296.20" in the letter referred to "major depression." No other information was provided.

Thereafter, on July 29, 1995, Rasmussen wrote Dr. Flanagan again, requesting more information on Gazda's status; she requested a description of what reasonable accommodations could be afforded to Gazda to make it possible for her to return to work and per-

form the essential functions of her job, and requested an expected return date. Dr. Flanagan did not respond. The company therefore at the time had no indication that Gazda would be able to return to work in a reasonable amount of time, or ever.

There is no dispute that Gazda never asked Pioneer for an accommodation to help her work while under Dr. Flanagan's or any other doctor's care. Gazda agrees that her doctor, Dr. Flanagan, never gave her or Pioneer a specific time when Gazda might be expected to return to work.

Shortly before August 11, 1995, Yust, Rasmussen and Henning met to discuss Gazda's indefinite absence and continued employment. They decided to terminate Gazda's employment based on Gazda's inability to return to work for an indefinite period of time, as set forth in her doctor's statements, and based on the company's perceived need to fill Gazda's position. On August 11, Rasmussen sent Gazda a letter officially terminating her employment setting forth these reasons. Gazda received this letter on August 13, 1995.

Gazda's position was filled by Robert Gray. Robert Gray had been hired as a temporary contract worker on July 17, 1995, to assist with systems support duties during Gazda's absence.[17] He was also classified as non-exempt (at his request) but was paid $300 *less* than Gazda. Like Gazda, Gray regularly worked overtime.[18] He received better performance reviews than Gazda.

On August 24, 1995, Gazda filed her Charge of Discrimination with the EEOC,[19] alleging discrimination based upon sex and disability, and retaliation. There is no evidence that Pioneer had any knowledge that Gazda had filed a charge with the EEOC when the company decided to terminate her employment.

**17.** After Gazda's employment was terminated, Pioneer interviewed several applicants to fill Gazda's position as Computer Operations Coordinator on a permanent basis. Gray interviewed for that position and was hired on November 16, 1995.

**18.** For example, one week in December 1995, he had 40.5 hours of overtime.

## III. SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *See Boze,* 912 F.2d at 804 (citing *Reid v. State Farm Mutual Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski,* 102 F.3d 190, 193 (5th Cir.1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *See Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–719 (5th Cir.1995). If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *Texas Manufactured Hous. Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *see Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 161 (5th

**19.** Gazda actually had been to the EEOC several weeks earlier, *before* her employment was terminated. Gazda went to the EEOC on July 28, 1995, to complain of alleged sexual discrimination and an ADA violation by Pioneer. However, Gazda did not file a charge until August 24, 1995. She stated that she did not think the first EEOC investigator reacted appropriately to her allegations, so she left and returned weeks later.

Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); *Transamerica,* 66 F.3d at 718–19; *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *See Douglass v. United Services Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1048 (5th Cir.1996); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little,* 37 F.3d at 1075. Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## IV. *LEGAL ANALYSIS*

### A. *Discrimination Claims*

Plaintiff argues that she was discharged by Defendant for an unlawful reason: either because she was a female, in retaliation for her complaints that she was suffering discrimination on the basis of her sex, or because she was disabled. Plaintiff also con-

tends that she was subjected to actionable sexual harassment during her employment and that Defendant retaliated against her because of her complaints of sexual harassment and Defendant's fear that she would file suit against the company. Defendant seeks summary judgment on all these claims on the grounds that Plaintiff cannot establish a *prima facie* case of any of these claims, and further that Plaintiff has failed to adduce sufficient evidence to establish that there is a genuine question of material fact of intentional wrongful conduct under these theories. The Court holds that Defendant is entitled to summary judgment on all Plaintiff's claims of discriminatory termination and sexual harassment, as well as on her claims of retaliation.

### 1. *Title VII Sex Discrimination and Retaliation Claims* [20]

### a. *Hostile Environment/Sexual Harassment Claim Relating to Defendant's Conduct during Plaintiff's Employment.*

Plaintiff's claims of hostile environment or sexual harassment are based upon conduct of her co-worker Bob Bissett in 1993 while she and Bissett were on a business trip in St. Gabriel, and upon conduct of her supervisor, Paul Yust. Defendant argues that these claims are time-barred since Plaintiff did not file a charge of discrimination within the statutory periods, and that Plaintiff has failed to meet the legal standards for hostile environment or sexual harassment claims as to anything about which she complains that is not time-barred.

*Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, and Fed.R.Civ.P. 56(e)). "Rule 56, therefore, saddles the non-movant with the duty to 'designate' the specific facts in the record that create genuine issues precluding summary judgment, and does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Jones,* 82 F.3d at 1338 (citations omitted); *accord Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996) ("Rule 56 does not impose a duty on the district court to sift through the record in search of evidence to support a party's opposition to summary judgment").

---

**20.** Plaintiff's Response to Defendant's Motion for Summary Judgment [Doc. # 40] ("Plaintiff's Response") has no headings or other indications of how her arguments and summaries of the depositions relate to Defendant's numerous points for summary judgment. The Court has parsed Plaintiff's Response (and her Motion for Partial Summary Judgment) to determine the relationship of her arguments to the grounds for relief in Defendant's Motion. After the movant presents a properly supported motion for summary judgment, the non-movant must then go beyond the pleadings, and by his or her own affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See*

**Legal Standard for Hostile Environment Claims.**—To state a claim for relief under a theory of hostile work environment, Plaintiff must show:

(1) that she belongs to a protected class,

(2) that she was subject to unwelcome harassment,

(3) that the harassment was based on sex,

(4) that the harassment affected a term, condition or privilege of employment, and

(5) that the employer knew or should have known about the harassment and failed to take prompt remedial action.

See Waymire v. Harris County, 86 F.3d 424, 428 (5th Cir.1996); Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997); DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.), cert. denied, 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995). In order for conduct to be actionable under a hostile environment theory, the conduct must create an abusive working environment that is both subjectively offensive to the plaintiff and sufficiently "severe or pervasive" to create an environment that, under an objective standard, a reasonable person would find hostile or abusive. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Weller, 84 F.3d at 194. In making such a determination, courts are to look to factors such as the frequency of the conduct, its severity, the degree to which it is physically threatening or humiliating, and the degree to which it unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 17, 114 S.Ct. 367; Weller, 84 F.3d at 194. Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected class-member's opportunity to succeed in the workplace." Conduct that only " 'sporadically wounds or offends but does not hinder a female employee's performance' " is not actionable. Weller, 84 F.3d at 194 (quoting DeAngelis, 51 F.3d at 593).[21]

Moreover, an employer is liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action. See Farpella–Crosby v. Horizon Health Care, 97 F.3d 803, 806 (5th Cir.1996); Hirras v. National R.R. Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996); Waymire, 86 F.3d at 428; Nash v. Electrospace System, Inc., 9 F.3d 401, 403 (5th Cir.1993) (citing Jones v. Flagship Int'l, 793 F.2d 714, 720 (5th Cir.1986)). An employer has satisfied the prompt remedial action requirement if it " 'took the allegation seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations.' " Waymire, 86 F.3d at 428 (quoting Carmon v. Lubrizol Corp., 17 F.3d 791, 795 (5th Cir. 1994)). "Whether an employer's response to discriminatory conduct is sufficient 'will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.' " Hirras, 95 F.3d at 399–400 (quoting Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir.1989)).

**Analysis of Plaintiff's Hostile Environment Claim.**—Plaintiff has failed to establish that she worked in a hostile environment during the period actionable in this case. Insofar as Plaintiff's claim is based on the St. Gabriel incidents in February 1993, the claim is time-barred. Plaintiff did not file a timely charge with the EEOC or a state agency charged with responsibility for enforcement of the discrimination laws.[22]

21. The Fifth Circuit in DeAngelis continued: "[A] hostile environment claim embodies ... conduct so egregious as to alter the conditions of the employment and destroy [women's] equal opportunity in the workplace. Any lesser standard of liability ... would attempt to insulate women from everyday insults as if they remained models of Victorian reticence." See DeAngelis, 51 F.3d at 593.

22. The Court does not reach the issue of whether Defendant's response constituted prompt remedial action. See Waymire, 86 F.3d at 428–29.

*See* 42 U.S.C. § 2000e–5(e)(1) (1994).[23] Timely filing of a claim with the EEOC or an appropriate state agency is a prerequisite to a Title VII action. *See Abrams v. Baylor College of Medicine,* 805 F.2d 528, 532 (5th Cir.1986); *Humphreys v. Medical Towers, Ltd.,* 893 F.Supp. 672, 683 (S.D.Tex.1995), *aff'd,* 100 F.3d 952 (5th Cir.1996). In sum, to the extent Plaintiff's claim is based on the St. Gabriel events in February 1993, the claim is not actionable as a matter of law.[24]

■ Plaintiff also appears to assert generally a hostile environment claim based on various actions by Yust, Bissett, and to a limited extent, other co-workers.[25] Assuming *arguendo*[26] that some of the conduct occurred within 180 days of Plaintiff's filing of her EEOC charge against Defendant, Plaintiff nevertheless has failed to adduce facts that rise to the level of actionable conduct under a hostile environment theory. *See Weller,* 84 F.3d at 194; *DeAngelis,* 51 F.3d at 593–94. Many of Plaintiff's complaints are examples of boorish or rude behavior, but are far from conduct making Plaintiff's employment intolerable or conduct so severe and pervasive as to destroy Plaintiff's opportunity to succeed in the workplace.

### b. *Disparate Treatment Claims*

Plaintiff appears to argue that she was subjected to disparate treatment in the conditions and terms of her employment because she was a woman.[27] Defendant counters that Plaintiff has failed to establish that she was treated differently than the male who held the same job she did and that she held a position comparable to other men with whom she compares herself. The Court agrees with each of these arguments.

### (i) *General Burdens of Proof Under Title VII.*

■ Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an individual with respect to that person's compensation, terms, conditions, or privileges of employment, or to otherwise adversely affect the person's status as an employee, because of that person's sex. *See* 42 U.S.C. § 2000e–2(a). Plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination, which requires:

(1) that she is a member of a protected class,

(2) that she was qualified for the position she held,

(3) that she was discharged or subject to adverse employment action, and

(4) that those outside the protected class were placed in her position following

23. This provision alternatively allows plaintiffs 180 days to file with the EEOC or 300 days to file with a state or local agency with the authority to grant or seek relief. *See* 42 U.S.C. § 2000e–5(e)(1).

24. Plaintiff has failed to allege or argue a continuing violation. *See Waltman,* 875 F.2d at 474–76; *Abrams,* 805 F.2d at 532; *Wilson v. Sysco Food Services of Dallas, Inc.,* 940 F.Supp. 1003, 1009 (N.D.Tex.1996). Nor is there any evidence to support such a contention.

25. Plaintiff's Complaint alleges:

During the course of its employment of Gazda, and in violation of Title VII, Pioneer subjected her to a hostile work environment tainted with sexual innuendos, sexually oriented comments, sexual advances and other conduct, such that her status as an employee was adversely affected because of her sex.

*See* Complaint [Doc. # 1], ¶ 8. Plaintiff has not meaningfully marshaled the facts to support this claim. The Court has considered the arguments in Plaintiff's Response to Defendant's Motion, which has passing references to limited factual matters. The Court also has considered the deposition excerpts submitted by Plaintiff and Defendant's summary of Plaintiff's evidence. Since Plaintiff has not objected to or disagreed in any way with Defendant's summary, the Court holds that Plaintiff has waived any such potential objection.

26. Plaintiff has not supplied a factual basis for this assumption.

27. Plaintiff's Complaint alleges:

During the course of its employment of Gazda, and in violation of Title VII, Pioneer demanded of her, because of her sex, longer hours of work, greater productivity, more arduous working conditions and otherwise imposed less favorable terms of employment on plaintiff, including those pertaining to her compensation, than were applicable to similarly situated males, and/or than would have been applicable to her had she been a male.

the discharge or otherwise received more favorable treatment. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995).

 If a plaintiff establishes this *prima facie* case, a presumption of discrimination is created, and the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for its actions. *See St. Mary's,* 509 U.S. at 506–07, 113 S.Ct. 2742; *Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 370 (5th Cir.1997); *Meinecke,* 66 F.3d at 83.[28] If defendant satisfies this burden, the presumption disappears and plaintiff must prove that the proffered reasons are a pretext for discrimination. *See Meinecke,* 66 F.3d at 83. The plaintiff must prove by a preponderance of the evidence that the defendant's articulated reason is false and that the defendant intentionally discriminated. *See Walton,* 119 F.3d at 370. Once an employer has proffered a nondiscriminatory reason, a plaintiff can avoid summary judgment if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer, *and* (2) creates a reasonable inference that sex was a determinative factor in the actions of which plaintiff complains. *See Walton,* 119 F.3d at 370; *Atkinson v. Denton Publ'g Co.,* 84 F.3d 144, 149 (5th Cir.1996).

Throughout the case, the plaintiff retains the ultimate burden of persuading the finder of fact not only that defendant's reasons are pretextual, but also that defendant intentionally discriminated against plaintiff. *See St. Mary's,* 509 U.S. at 506–07, 113 S.Ct. 2742;

*Meinecke,* 66 F.3d at 83. Even if defendant's proffered reason is rejected, "enough evidence must exist in the record for the factfinder to infer that discrimination was the true reason for the disparate treatment." *Polanco,* 78 F.3d at 976–77 (citing *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir. 1996) (en banc)).[29]

 A plaintiff may not rely on merely conclusory assertions or personal opinion in an affidavit to defeat a motion for summary judgment. *See Douglass,* 65 F.3d at 459; *Little,* 37 F.3d at 1075. Furthermore, the allegations made in a plaintiffs' complaint are not summary judgment evidence. *See Wallace,* 80 F.3d at 1047.

**(ii) *Analysis of Disparate Treatment Claims.***

 *Disparate Treatment During Employment.*—Plaintiff has not established that the conditions of her employment were less favorable than the conditions for others (including her male replacement) who held her position. Plaintiff earned more than her replacement, Robert Gray, who was paid $300 less than Plaintiff. Plaintiff was warned before taking the job as Computer Systems Coordinator that she would need to work substantial overtime, since the upgrading of the company's computers and other related work could not be done during ordinary business hours.[30] The evidence of record establishes that the employee who replaced Plaintiff also had to perform substantial overtime work.[31]

In addition, to the extent Plaintiff compares herself to Bissett or Percival, she has failed to introduce any evidence that estab-

---

*See* Complaint, ¶ 7.

**28.** The burden on defendant to proffer a nondiscriminatory reason for its action is a burden of production, and is satisfied regardless of the persuasive effect of the proffered reason. *See St. Mary's,* 509 U.S. at 506–07, 113 S.Ct. 2742; *Polanco v. City of Austin, Tex.,* 78 F.3d 968, 976 (5th Cir.1996). Furthermore, once defendant proffers a reason, it is plaintiffs' burden, rather than defendant's, to prove that the proffered reasons are a pretext for discrimination and to persuade the finder of fact that defendant *intentionally* discriminated against plaintiff. *See St. Mary's,* 509 U.S. at 511, 113 S.Ct. 2742; *Polanco,* 78 F.3d at 976.

**29.** However, " '[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination.' " *Polanco,* 78 F.3d at 976 (quoting *St. Mary's,* 509 U.S. at 511, 113 S.Ct. 2742).

**30.** Both Plaintiff and Gray were given the choice to be either exempt or non-exempt employees. They each chose to be non-exempt in order to receive overtime compensation.

**31.** Nothing submitted by Plaintiff contradicts Defendant's evidence or arguments.

lishes that her position and associated duties were the same as those men's. Indeed, the only evidence of record (which was submitted by Defendant), namely job descriptions of each of the individuals in question, establishes that the Plaintiff's job duties and training were not comparable to Bissett's or Percival's, and thus her salary and other terms of employment are not required to be equal. Thus, Plaintiff has failed to raise a genuine question of fact that Defendant treated comparably situated employees differently. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995) (claim of pay discrimination under title VII requires proof of intentional discrimination and proof that male employees were paid more alone does not support such inference); *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 525 (7th Cir. 1994) (to establish wage discrimination under Title VII, plaintiff must show intent to discriminate, and intent must encompass actual desire to pay plaintiff less than men because plaintiff is a woman).

As to Plaintiff's complaints about her office, job hours, and cessation of co-workers having lunch with her, she fails to state a legally viable claim. As noted above, the duties associated with Plaintiff's position required long hours and significant overtime. Nothing discriminatory relating to this aspect of Plaintiff's employment has been shown. Finally, Defendant is not legally responsible for workers' personal decisions about the employees with whom they chose to socialize. Plaintiff has not alleged or provided any evidence that Defendant caused the co-workers to stop inviting Plaintiff to lunch.

■ *Termination Because of Sex.*—Defendant argues that Plaintiff cannot establish a *prima facie* case that she was terminated on the basis of her being female. Defendant further argues that even if Plaintiff is able to establish the elements of a *prima facie* case of sex discrimination, she fails to establish that Defendant's proffered reason for the termination was mere pretext and that the termination was based on Plaintiff's sex.

Plaintiff is female and was replaced in her job by a male. However, at the time she was terminated she was not qualified to perform her job. Plaintiff could not come and was not coming to work. She therefore has failed to establish the second element of the *prima facie* case of sex discrimination. Thus, Defendant is entitled to summary judgment on Plaintiff's claim of discriminatory termination on the basis of her sex.

Moreover, Plaintiff has failed to rebut in any way the Defendant's proffered explanation[1] of the termination. Defendant's proffered reason for termination of Plaintiff's employment—that she was unavailable for work for an "indefinite period of time," and that Defendant needed to train a replacement and to fill the spot with a permanent employee—has not been rebutted by any evidence. Plaintiff's submissions have no cogent argument to contradict this explanation. Plaintiff's Response to Defendant's Motion generally focuses on the 1993 St. Gabriel incidents.

#### c. *Retaliatory Termination for Complaints as to Sexual Harassment*

Defendant also seeks summary judgment on the ground that the termination of Plaintiff was not retaliatory and Plaintiff can establish neither a *prima facie* case nor establish that the Defendant's proffered reason for termination was pretext. Plaintiff seems to argue that because Defendant's representatives were concerned about the general possibility that Plaintiff might assert a claim against the company, the act of termination of Plaintiff was retaliatory. The Court holds for several reasons that Plaintiff has failed to meet her summary judgment burden on this issue.

■ *Legal Standard for Retaliation Claims.*—To establish a *prima facie* case of retaliatory termination of employment, Plaintiff must produce competent evidence from which a jury could find that:

(1) the plaintiff engaged in an activity protected by Title VII,

(2) the plaintiff was thereafter subjected to some adverse employment action, and

(3) there was a causal connection between the plaintiff's participation in

the protected activity and the defendant's decision to take the adverse employment action.

*See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir.1997); *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992). Causation may be inferred from the employer's knowledge of the activities and the temporal proximity of this knowledge and the adverse action. *See Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 n. 23 (5th Cir.1995); *see, e.g., Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 n. 13 (5th Cir.1981). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation. However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir.1997), *petition for cert. filed*, —— U.S. ——, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997).

■ *Analysis of Retaliation Claims.*— Plaintiff does not argue that her termination was in retaliation for her filing an EEOC charge, since it was not filed until August 24, 1995, weeks after her termination.[32] Rather, Plaintiff Gazda cites the Court to deposition excerpts that Defendant feared that she might file a charge, since she discussed the St. Gabriel events of 1993 with Rasmussen on several occasions. *See* Plaintiff's Response, at 3, 6.

Since Plaintiff's complaints preceded Defendant's decision to terminate Plaintiff's employment and were known to Defendant, Plaintiff has established a *prima facie* claim

of retaliation on this theory. However, in response to Defendant's proffered legitimate explanation—namely, that Plaintiff was terminated for her failure and inability to come to work after June 23, 1995—Plaintiff has not presented anything other than her own unsubstantiated opinions that there was a causal connection in Defendant's decisionmaking between Plaintiff's complaints and her termination. Two and a half years had passed between the St. Gabriel incident and Plaintiff's termination. By Plaintiff's own accounts, she had mentioned the 1993 incidents to Rasmussen several times, but Plaintiff was not terminated until she stopped coming to work. Indeed, Plaintiff's argument proves too much: rather than seeking to terminate her employment, Defendant feared terminating Plaintiff. Viewing the evidence of record as a whole, the Court concludes that Plaintiff has adduced at best a scintilla of evidence of retaliatory intent, and no inference or retaliation is reasonable.[33]

Finally, Plaintiff must show in a Title VII claim that the employer based the adverse employment action on an improper motive. *See Wilson v. Belmont Homes, Inc.*, 970 F.2d 53, 57 (5th Cir.1992). Plaintiff cannot prevail merely because she has shown the employer's decisionmaking process to have been flawed or the product of poor business judgment or poor personnel practices. *See id.* at 57 ( "Our inquiry is *not* into the *merits of the employer's employment decisions* but into the motives.") (emphasis added).

The Court therefore concludes that Defendant's alleged concern that Plaintiff might file suit if she were terminated is, in light of all the evidence in the summary judgment record, at best a scintilla of evidence to establish the necessary causation for a claim of

---

**32.** Plaintiff also visited with an EEOC representative prior to her termination. However, this fact is insufficient to meet Plaintiff's proof obligations on summary judgment. The Court is aware of no evidence establishing that Pioneer was aware of Plaintiff's pre-termination contact with the EEOC.

**33.** In establishing a causal connection, "[t]he timing of the adverse employment action can be a significant, although not necessarily determina-

tive, factor." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir.1995); *see Shirley*, 970 F.2d at 43 (14 months between filing of EEOC complaint and discharge "not conclusive" as to finding of no retaliation). Lapse of time may suggest, however, that a retaliatory motive is "highly unlikely." *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir.1994) (10 month lapse between complaint to supervisor and adverse employment action).

retaliation. *See Douglass*, 65 F.3d at 459; *Little*, 37 F.3d at 1075.

## 2. *Disability Discrimination (Americans With Disabilities Act ("ADA"))*

Defendant argues that Plaintiff has failed to establish a *prima facie* case that she was wrongfully terminated from her position with Defendant in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). *See* Defendant's Motion, at 29–31. Defendant argues that Plaintiff can-not establish a *prima facie* case of disability discrimination.[34] Defendant further argues that even if Plaintiff was disabled and was nevertheless qualified for her job at Pioneer, Plaintiff cannot show that she requested a "reasonable accommodation." Rather than responding directly to Defendant's Motion, Plaintiff has cross-moved for partial sum-mary judgment on the ADA claim contending that Defendant failed to make a reasonable accommodation when it terminated Plaintiff in the face of her request for an indefinite leave of absence for "major depression." Plaintiff's Motion, at 1–13. Plaintiff contends that a reasonable accommodation would have been to allow six months leave (like execu-tives received in their employment contracts) to allow her to heal or to determine that she would not heal.[35]

 The Court considers Defendant's ar-guments first. Defendant contends that Plaintiff cannot establish that she is "dis-abled" or that she was "qualified for the job" as Computer Operations Coordinator for De-fendant when she was terminated on August 11, 1995. As to the first element of Plaintiff's claim, the Court assumes for the purpose of those motions that Plaintiff has raised a question of fact that she was "disabled" and yet was "qualified for the job" during her leave of absence.[36]

**34.** Under the ADA, a plaintiff must prove that she:
 (1) suffers from a "disability";
 (2) is qualified for the job;
 (3) was subject to an adverse employment ac-tion; and
 (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees.
*Daigle v. Liberty Life Insurance Co.*, 70 F.3d 394, 396 (5th Cir.1995). In order to meet the thresh-old requirement of "disability," an individual must show: a physical or mental impairment that substantially impairs one of more of the major life activities of the individual, a record of such an impairment, or being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336 (5th Cir.1997); *Rogers v. International Ma-rine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

**35.** Plaintiff appears to rely on the Affidavit of Victoria Sloan, Ph.D. [Doc. # 41] ("Sloan Affida-vit") a clinical psychologist, and her report (Ex-hibit 2 to Sloan Affidavit) who opines that Plain-tiff needed two months without an intervening termination of employment and loss of insurance to recover from her psychological problems. It appears from Dr. Sloan's affidavit and support-ing report, dated December 19, 1996, that Plain-tiff was "seen" by Dr. Sloan from at least Febru-ary 19, 1996 through the time of Dr. Sloan's report. Dr. Sloan reports that Plaintiff experi-enced

> psychiatric symptoms which classically paral-lel those observed in trauma victims (i.e., fea-tures of Post Traumatic [S]tress Disorder, secondary to a primary diagnosis of Major Depression). Moreover, the patient's emo-tional difficulties appear to reflect multiple traumas including her employment history with [Defendant] characterized by blatant in-justices, humiliations and numerous victim-izations perpetrated by superiors and col-leagues; loss of identity and status associated with employment, and a severe deterioration in psychological and emotional functioning. As such, Mrs. Gazda's symptom constellation mirrors those often experienced by victims of rape and persons subjected to physical and/or psychological trauma within institutional set-tings. . . .
>
> Research in the area of psychological trauma perpetrated in institutional settings represents an emerging field of study. As such, available data obtained from studies conducted with vic-tims of rape, combat war veterans, and victims of civilian disaster will be employed. . . .

*See* Report of Victoria Sloan, Ph.D. (Exhibit 2 to Sloan Affidavit), at 1. Dr. Sloan gave no exam-ples in the report of the incidents on which she based her conclusions. Lastly, it is unclear whether her theories (*i.e.*, her analogy to rape, combat war veterans or civilian disasters) are accepted by other professionals in the field of psychology.

**36.** Plaintiff, by her own Partial Summary Judg-ment Motion, invited the burden to prove that there was no genuine question of material fact that she was "disabled" and was a "qualified" individual, two of the elements of Plaintiff's claim on which she has the burden of proof at trial. If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with "significant probative evidence" that there

On the other hand, as to the second element, Plaintiff fails to establish on this summary judgment record that there is a genuine question that she was a "qualified individual with a disability" on the date she was terminated. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added); *see* 29 C.F.R. § 1630.2(m) (1996); *Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678, 681 (5th Cir.1996); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 763 (5th Cir.1996); *Tyndall v. National Educ. Centers, Inc.*, 31 F.3d 209, 213 (4th Cir.1994).

Thus, in this case, to defeat Defendant's Motion, Plaintiff must establish that there is a genuine question of fact as to whether she was capable of performing the essential duties of her position on August 11, 1995, approximately two weeks after Dr. Flanagan stated Plaintiff was in need of an *indefinite leave* of absence and that Plaintiff could not communicate with anyone at her place of employment. Plaintiff's arguments prove too much. Plaintiff, in demonstrating that she was "disabled," relies on the very materials

that foreclose her argument that she was capable of performing her duties. Plaintiff has shown without contradiction that from early July 1995 onward she could not work at all, and could not even be present at work or communicate with her co-workers. Plaintiff was entirely unavailable for work. Her work needed to be performed on site, at Defendant's premises. Since Plaintiff could not associate or communicate with any of her co-workers, she was not able to perform her duties, and thus was not a qualified individual. *See Rogers*, 87 F.3d at 759 ("'An essential element of any … job is an ability to appear for work … and to complete assigned tasks within a reasonable period of time.'") (citing *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994)); *Carr*, 23 F.3d at 530 (D.C.Cir.1994); *Tyndall*, 31 F.3d at 213 (an employee "who does not come to work cannot perform any of his [or her] job functions, essential or otherwise").

■ Plaintiff argues in response that she was entitled to a six-month leave of absence to determine whether she would then be able to return to her job duties. Plaintiff relies on Dr. Sloan's Affidavit to suggest that after two months of leave Plaintiff would have been able to return to the office and perform

---

is an issue of material fact so as to warrant a trial. *See Nederland*, 101 F.3d at 1099; *Taylor*, 93 F.3d at 161; *Transamerica*, 66 F.3d at 718–19; *Forsyth*, 19 F.3d at 1533.

The Court cannot definitively make a determination on these issues, as Plaintiff requests in her motion. To prove she suffered from an actionable "disability" at the time of her discharge from Pioneer, Plaintiff relies entirely on circumstantial evidence requiring inferences at the outer limits of reasonableness. Plaintiff's only contemporaneous evidence is Dr. Flanagan's letter of July 26, 1995, stating that Plaintiff suffered from a condition identified by the doctor in the letter only as insurance "diagnostic code 296.20," which the doctor's office informed Rasmussen meant "major depression." Plaintiff has directed the Court to no evidence about her day-to-day symptoms during the seven weeks she was on leave. "Chronic depression" per se does not mean the employee is necessarily disabled under the ADA. *Bethel v. City of Garland*, No. 3–96–CV–11–3–BD, 1997 WL 325983, at *3 (N.D.Tex. June 11, 1997) (unreported opinion). It thus is far from clear from Dr. Flanagan's perspective that Plaintiff's "major depression" is a "disability" under the ADA.

Plaintiff also relies on the Affidavit of Dr. Sloan, a clinical psychologist, who reports that she saw Plaintiff from February 19, 1996 through December 1996. Dr. Sloan indicates that *during the period she saw Plaintiff*, Plaintiff suffered from "severe depression and associated symptoms" described in a letter report she provided to Plaintiff's counsel on December 19, 1996. *See* Sloan Affidavit, at ¶ 4. Thus, Dr. Sloan's affidavit is not competent evidence and is not probative of Plaintiff's condition or performance capabilities during her leave or prior employment. Additionally, Dr. Sloan's opinions are mere unsupported conclusions that have barely been tied to the facts of record in this case. *See, e.g.*, Sloan Affidavit, ¶ 4. Plaintiff argues in a different vein that before her leave, while she was at work, she was able to perform the essentials of her job. The deposition excerpts submitted by Plaintiff establish that she had difficulties on the job but was performing the duties to some degree, albeit apparently not always to her supervisor's (Yust's) satisfaction. For this reason Yust gave Plaintiff performance ratings of "2" ("below acceptable level") out of "5" for 1994 and 1995. In any event, this evidence does not establish that Plaintiff was able to perform her duties after she commenced her leave.

her duties had the termination not occurred, or that, at most, six months after Plaintiff took leave, she .would have been able to return. *See* Sloan Affidavit, ¶ 6. Even if this assertion had any basis in the factual record before the Court,[37] it would be legally ineffective.

Plaintiff has the burden to demonstrate that she sought a reasonable accommodation. *See Riel*, 99 F.3d at 683 (reasonable accommodation is element of *prima facie* case of discrimination under ADA, and plaintiff therefore bears burden of proof of reasonableness). Recent appellate decisions have made it clear that an employer is not required to provide leave (even unpaid) of unlimited or unknown duration as a reasonable accommodation. *See Burch v. Coca–Cola Co.*, 119 F.3d 305, 319 n. 11; *see, e.g., Rogers*, 87 F.3d at 759; *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th

Cir.1996) (plaintiff failed to present evidence from which reasonable jury could find that accommodation she urged—unpaid leave of an indefinite duration—was reasonable); *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995) (quoted with approval by Fifth Circuit in *Rogers, supra*, "reasonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected ...."); *Johnson v. Foulds*, No. 96–2961, 1997 WL 78599, at *3 (7th Cir. Feb.19, 1997) (unreported opinion).

### 3. *Family and Medical Leave Act*

■ Defendant argues it is entitled to summary judgment under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), since Plaintiff has not and cannot establish one of the elements of her claim, *viz*, that she is "eligible" to take leave under the Act.[38] Defendant principally argues

---

**37.** Dr. Sloan's conclusion is based on a premise that Plaintiff has failed to establish in the summary judgment record: Sloan states "assuming the uninterrupted continuation of Dr. Flanagan's *successful* therapy, it is very likely that the recovery period necessary to allow Gazda's resumption of work would have ended sometime in or before December, 1995." *Id.* ¶ 7 (emphasis added). Plaintiff has not submitted any evidence from Dr. Flanagan. The Court cannot discern evidence in the summary judgment record to establish that Plaintiff's therapy with Dr. Flanagan was occurring or was successful. Nor is there anything to suggest that Dr. Sloan knew what Plaintiff's duties were, or that she in fact had a basis for this opinion.

**38.** The FMLA provides eligible employees up to 12 weeks of unpaid leave each year for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Upon return from leave, an eligible employee is entitled to return to the same or an equivalent position. `See` 29 U.S.C. § 2614(a)(1)(A). It is not necessary for an employee to expressly invoke the FMLA, but information given to an employer must be sufficient to give reasonable notice of a request for leave for a serious health condition. *See Price*, 119 F.3d at 335 n. 17. In addition to providing leave for eligible employees, the Act protects these employees from, *inter alia*, discrimination: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). Establishing a *prima facie* case of discrimination in violation of the FMLA is similar to establishing one under Title VII. *See Garcia v. Fulbright and Jaworski,*

*L.L.P.*, No. H–95–0053, 1996 WL 544371, at *6 (S.D.Tex. Aug.15 1996) (unpublished opinion) (citing *Lempres v. CBS Inc.*, 916 F.Supp. 15, 23 n. 37 (D.D.C.1996)); *Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 259 (N.D.Miss.1995), *aff'd*, 74 F.3d 91 (5th Cir.1996). The plaintiff must demonstrate that (1) she is protected under the FMLA, (2) that she suffered an adverse employment decision, (3) that she was treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because of the plaintiff's request for leave. *See Garcia*, 1996 WL 544371, at *6; *Oswalt*, 889 F.Supp. at 259. If plaintiff succeeds in making a *prima facie* case, the burden of proof shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *See Garcia*, 1996 WL 544371, at *6; *Oswalt*, 889 F.Supp. at 259. Once the defendant has done so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's reason is a pretext for unlawful discrimination. *See Garcia*, 1996 WL 544371, at *6; *Oswalt*, 889 F.Supp. at 259.

In this case, Gazda claims as to the FMLA that Pioneer denied Gazda the total of 12 workweeks of leave during a 12 month period to which she was entitled under the FMLA to deal with a serious health condition that made her unable to perform the functions of her position, discriminated against her in violation of the FMLA by terminating her employment because she actually took some leave for such purpose, but less than 12 weeks, and it threatens, and continues to threaten in violation of the FMLA, to deny her restoration to the same or equivalent position.

*See* Plaintiff's Response, at 2. To the extent that Plaintiff claims discrimination and failure to re-

that Plaintiff cannot establish that Defendant or its affiliates employed the requisite number of employees on or about the time she requested the leave that resulted in the FMLA violation of which she complains. Plaintiff has not filed a direct response to Defendant's Motion; instead, she moves for partial summary judgment in her favor on the FMLA claim. *See* Plaintiff's Response, at 8; Plaintiff's Motion, at 13–14.

The Court has analyzed the evidence in light of the summary judgment burdens on Plaintiff in responding to Defendant's Summary Judgment Motion, as well as the burden on Plaintiff in connection with her own Motion for Partial Summary Judgment. Plaintiff has failed to meet her burden on both Motions.

The parties agree that Gazda sought sick leave on June 22, 1995, to commence on June 23, 1995. She continued on leave until she was terminated seven weeks later, on August 11, 1995. There is no dispute that Defendant Pioneer failed to grant Plaintiff a leave of absence of at least twelve weeks, as required under the FMLA. Additionally, there is no dispute that Pioneer is a "covered employer" under the FMLA regulations (29 C.F.R. § 825.104).[39]

The legal issue before the Court on this claim is whether Gazda was "an eligible employee" under the FMLA. The parties agree that in this connection, Plaintiff must demonstrate that she was "employed at a work site where 50 or more employees were employed by the employer within 75 miles of that work site," 29 C.F.R. § 825.110(a)(3), and that the 50 employees were employed "when the employee g[ave] notice of the need for leave." 29 C.F.R. § 825.110(f).

Since Gazda gave notice of her leave on June 22, 1995, and she worked at the Houston office of Pioneer, the Court has evaluated the summary judgment record to determine if either party has sustained its or her burden of proof as to the number of "employees" the company had at or within 75 miles of the Houston office in late June 1995.[40]

Defendant has produced comprehensive lists of all its employees who worked in Texas for Defendant or its affiliated companies[41] at any time during 1995. These lists are

store her to the same position under the FMLA, she has not articulated arguments or directed the Court to evidence on these claims sufficient to raise an issue of material fact. In any event, because the Court finds that Plaintiff is not "eligible" to invoke the FMLA, all claims under the Act necessarily must fail.

**39.** A covered employer is defined as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i); 29 C.F.R. § 825.104. Pioneer admits that it has more than 50 employees nationwide.

**40.** Arguably, the key date is sometime in July 1995, when Plaintiff's doctor, Dr. Flanagan, informed the company that Plaintiff required an "indefinite leave" due to her "medical" condition. The difference in these dates is immaterial to the factual or legal issues dividing the parties. In addition, Defendant points out that applicable regulations require that Plaintiff prove that she worked at least 1250 hours during the twelve month period immediately preceding the commencement of the leave. *See* 29 C.F.R. § 825.110(a)(2). In her briefing Plaintiff has directed the Court to no such evidence and the Court's perusal of Plaintiff's exhibits fails to reveal this information of hours during the relevant twelve month period. However, Plaintiff reported working 175 overtime hours in 1994 and 125 hours overtime in 1995. *See* Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, Answer to Interrogatory No. 11 (Exh. 12 to John Sieger Affidavit [Doc. # 42]). Thus, the Court will assume for the purposes of these Motions that Plaintiff worked a standard forty (40) hour week for Defendant, and thus assumes that she met the 1250 hour minimum.

**41.** Defendant also has submitted the Affidavit of Danya Blair ("Blair Affidavit"), Exh. 2 to Defendant's Objections to Plaintiff's Summary Judgment Evidence and Response to Plaintiff's Motion for Partial Summary Judgment [Doc. # 43]. Ms. Blair establishes with sufficient evidentiary basis that Defendant's subsidiaries had no employees in Texas. Plaintiff has produced no probative evidence in response.

Normally the legal entity that employs the employee is the "employer" under the FMLA. Applying this principle, a corporation is a single employer rather than its separate establishments or divisions. *See* 29 C.F.R. § 825.104(c). Where one corporation has an ownership interest in another corporation, it is a separate employer unless it meets the "joint employment" test discussed in 29 C.F.R. § 825.106, or the "integrated employer" test in 29 C.F.R. § 825.104(c)(2). *See* 29 C.F.R. § 825.104(c).

derived from Defendant's personnel, payroll, and benefits records, according to the affidavit of Rasmussen, the Human Resources Supervisor, and are admissible evidence. The Court's review of these records convinces it that Defendant actually employed at most 32 employees in or around Houston during the second half of June and early July 1995.

Plaintiff attempts to create a fact question by directing the Court to different evidence. Plaintiff relies on 48 different W–2 forms as proof that Defendant had 48 "acknowledged employees at the relevant times." Plaintiff's Motion, at 13 & n. 4.[42] Plaintiff's evidence is unavailing, however. The W–2 forms, each issued by Defendant in 1995, do not identify the dates of employment of each employee and do not establish the location of any employee's work site.[43]

Even crediting for the purposes of this Motion Plaintiff's theory that everyone who received a Form W–2 from Defendant in 1995 worked in or near Houston—a proposition that requires pure speculation—Plaintiff has not proven the requisite 50 Texas employees.[44]

The Court concludes that Plaintiff has submitted at best a scintilla of evidence to rebut the arguments of Defendant or to support Plaintiff's own Motion for Summary Judgment. This is insufficient. *See Douglass*, 65 F.3d at 459; *Little*, 37 F.3d at 1075. The Court cannot, in the absence of any proof, assume that the nonmovant could or would prove the necessary facts. *See Wallace*, 80 F.3d at 1048; *McCallum Highlands*, 66 F.3d at 92; *Little*, 37 F.3d at 1075.[45]

**42.** *See* Exhibit 8 to Sieger Affidavit [Doc. # 42].

**43.** Indeed, according to the W–2 forms, several of the listed employees do not have Houston addresses. For instance, two employees apparently lived in Pennsylvania, several employees lived in Georgia, Nevada, Louisiana, Tennessee or California. *See* Exh. 8 to Sieger Affidavit. Moreover, of the 48 individuals who received W–2 Forms, Rasmussen's Affidavit establishes indisputably that one of them was terminated and the other was deceased by June, 1995.

**44.** Plaintiff's reliance on the 48 different W–2 Forms is futile. Ten of these individuals did not live in Houston or environs. In an implicit acknowledgement of her numerical difficulties, Plaintiff also vaguely refers to six individuals who received Internal Revenue Service 1099 Forms from Defendant in 1995. These 1099 Forms do not assist Plaintiff. Nothing indicates that the individuals who received payments were anything other than independent contractors, as 1099 Forms typically indicate. Second, no evidence establishes that any of the individuals performed services for Defendant during June 1995, the relevant time period. None of the information is submitted by Plaintiff on personal knowledge. Indeed, Rasmussen is the only person identified in the record who potentially has relevant knowledge and her affidavits directly contradict Plaintiff's arguments. No evidence has been submitted as to the functions of these individuals or their duties. For the purposes of the FMLA, in general, "an employee, as distinguished from an independent contractor who is engaged in a business of his/her own, is one who 'follows the usual path of an employee' and is dependent on the business which he/she serves." 29 C.F.R. § 825.105; *see also Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993) (under Texas law, when determining whether a party is an employee or an independent contractor, the

law focuses on the right of control over the details of the work to be performed). Even if the Court were to deem the six individuals identified by Plaintiff who received 1099 Forms to be "employees" for purposes of these Motions, there is no basis to assume that they rendered services in June, 1995.

Plaintiff also attempts to rely on two employment contracts with Defendant's affiliate, Pioneer Americas, Inc., for two executives, Frank B. Belliss and Verrill M. Norwood, Jr., executed in 1995. *See* Plaintiff's Motion, at 13, Exhs. 9 and 11. This evidence is not probative of Plaintiff's theory that these men worked in Texas. The contracts on their faces reveal that these individuals live in California and Tennessee, respectively, and that their agreements were to be governed by the laws of the men's states of residence. Neither the contracts nor other evidence contain anything to suggest that these two executives worked in Texas in 1995.

Finally, Plaintiff argues that the Court should include in the minimum 50 "employees" the individuals with nationwide responsibilities or individuals living outside the 75 mile radius of Houston, but who report to Houston. Plaintiff, however, has supplied no legal authority for such an interpretation of the FMLA regulations. The Court declines to follow Plaintiff's suggestion.

**45.** Throughout her motion and responses to Defendant's Motion, Plaintiff complains that she has been denied discovery. This is not persuasive nor dispositive at this stage of the case, particularly in light of the several discovery conferences the Court conducted with the parties on short notice when requested to resolve discovery disputes. *See* Blair Affidavit and attachments thereto, to Defendant's Objections to Plaintiff's Summary Judgment Evidence and Response to Plaintiff's Motion for Partial Summary Judgment

Therefore, there is no genuine question of material fact and Pioneer is entitled to summary judgment on Plaintiff's claim for alleged employment termination and violation of the FMLA.

## B. *Intentional Infliction of Emotional Distress Claim*

■ Defendant contends that Plaintiff cannot establish that her termination or the conduct by Defendant's employees towards Plaintiff give rise to a claim of intentional infliction of emotional distress.[46] The Court agrees.

■ In order to recover damages for intentional infliction of emotional distress, Plaintiff must prove the following:

(1) Defendants acted intentionally or recklessly;

(2) Defendants' conduct was extreme and outrageous;

(3) Defendants' actions caused Plaintiff emotional distress; and,

(4) the resulting emotional distress was severe.

*Hirras*, 95 F.3d at 400; *MacArthur v. University of Texas Health Ctr. at Tyler*, 45 F.3d 890, 898 (5th Cir.1995); *Danawala v. Houston Lighting & Power Co.*, 14 F.3d 251, 256

(5th Cir.1993); *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993). Liability for outrageous conduct "should be found 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman*, 855 S.W.2d at 621 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); *accord, MacArthur*, 45 F.3d at 898.[47]

■ An employer's conduct, even if a Title VII violation, rises to the level of extreme and outrageous in only the most unusual cases. *Hirras*, 95 F.3d at 400 (citing *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654 (5th Cir.1994)). For complaints that fall within the realm of an ordinary employment dispute, the claim of intentional infliction of emotional distress does not lie. *See MacArthur*, 45 F.3d at 898; *Johnson v. Merrell Dow*, 965 F.2d at 33–34.

Plaintiff has presented no evidence to support any claim of outrageous conduct by Defendant, Plaintiff's supervisor, or others at the workplace. At best, there was inappropriate profanity or vulgar language used by co-workers, anger expressed by Plaintiff's supervisor on occasion, or shunning by co-workers.[48] The Court concludes that Defen-

---

[Doc. # 43]. Additionally, in part, Plaintiff failed to comply with Rule 56(f) of the Federal Rules of Civil Procedure, which requires that a party who seeks additional time to obtain proof to respond to a motion for summary judgment must submit an affidavit containing particulars of the information sought and why the information would assist in the party's preparation of the response. *See* Fed. R. Civ. Pro. 56(f); *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir.1997); *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 930 & n. 7 (5th Cir.1995). It is too late for Plaintiff to do so at this stage. Discovery was closed months ago.

Finally, Plaintiff asks the Court to engage in sheer speculation when she makes oblique references to paralegals at the Defendant company's law firm and to others who received 1099 Forms to reach the minimum number of "employees."

**46.** Plaintiff does not address this argument in her filings on the pending Motions.

**47.** *See also Burden v. General Dynamics Corp.*, 60 F.3d 213, 218 (5th Cir.1995) (summary judgment for employer on claim of intentional infliction of emotional distress affirmed, rejecting Plaintiff's allegations that despite his excellent job perfor-

mance, suffered humiliation and health problems when he was reclassified to an isolated position, was given no input into critical management decisions, was ostracized and given menial assignments, and lost his office and secretary); *Johnson v. Merrell Dow Pharmaceuticals, Inc. .*, 965 F.2d 31 (5th Cir.1992) (summary judgment for employer on claim of intentional infliction of emotional distress affirmed, despite allegations that Plaintiff was told that he did not "fit in" with the company, and that his supervisor was extremely hostile, constantly criticized him, threatened him with termination, reassigned his sales territory and removed a sale from his credits); *cf. Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993) (calling employee "Mexican" or "wetback" does not support claim for intentional infliction of emotional distress).

**48.** Through her reliance on Dr. Sloan's Affidavit, Plaintiff inconsistently cites all of these circumstances as illustrations of *Plaintiff's* heightened sensitivities during her employment, rather than examples of the other workers' misconduct. It is difficult to reconcile Plaintiff's shifting positions in this case.

dant is entitled to summary judgment on all of Plaintiff's intentional infliction of emotional distress claims.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's Motion for Summary Judgment must be granted and Plaintiff's Motion for Partial Summary Judgment must be denied. It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 37] is **GRANTED.** It is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Doc. # 39] is **DENIED.**